UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALFREDO ESCOBAR,

        Plaintiff,

    v.

CHRISTOPHER SMITH et al.,

        Defendants.

No.  2:12-cv-0773 GEB DAD P

FINDINGS AND RECOMMENDATIONS

Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under 42 U.S.C. § 1983.  This matter is before the court on defendants' motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has filed an opposition to the motion, and defendants have filed a reply.  For the reasons discussed herein, the court will recommend that defendants' motion for summary judgment be denied.

**BACKGROUND**

Plaintiff is proceeding on his original complaint in this civil rights action.  Therein, plaintiff alleges that he has long suffered from recurrent, multiple, painful tumors of the face and neck, diagnosed as hemangiomas.  According to plaintiff, prison officials at Calipatria State Prison transferred him to Mule Creek State Prison ("MCSP"), believing he would receive more effective medical care there because of its "hospital" status.  Plaintiff alleges, however, that when he arrived at MCSP, defendants Dr. Heatley and Dr. Smith disapproved of Calipatria physicians'

1

1    surgical requests and recommendations and discontinued his pain medication.  Plaintiff claims

2    that the defendants violated his rights under the Eighth Amendment and requests injunctive relief

3    and monetary damages.  (Pl.'s Compl. at 2-8.)

4                    **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

5          Summary judgment is appropriate when the moving party "shows that there is no genuine

6    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

7    Civ. P. 56(a).

8          Under summary judgment practice, the moving party "initially bears the burden of

9    proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

10   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

11   The moving party may accomplish this by "citing to particular parts of materials in the record,

12   including depositions, documents, electronically store information, affidavits or declarations,

13   stipulations (including those made for purposes of the motion only), admission, interrogatory

14   answers, or other materials" or by showing that such materials "do not establish the absence or

15   presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

16   support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden

17   of proof at trial, "the moving party need only prove that there is an absence of evidence to support

18   the nonmoving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.).

19   See also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after

20   adequate time for discovery and upon motion, against a party who fails to make a showing

21   sufficient to establish the existence of an element essential to that party's case, and on which that

22   party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure

23   of proof concerning an essential element of the nonmoving party's case necessarily renders all

24   other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so

25   long as whatever is before the district court demonstrates that the standard for entry of summary

26   judgment, . . ., is satisfied."  Id. at 323.

27          If the moving party meets its initial responsibility, the burden then shifts to the opposing

28   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

1    Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

2    existence of this factual dispute, the opposing party may not rely upon the allegations or denials

3    of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

4    admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

5    Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

6    fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

7    governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

8    Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

9    genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

10   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

11          In the endeavor to establish the existence of a factual dispute, the opposing party need not

12   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

13   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

14   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

15   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

16   Matsushita, 475 U.S. at 587 (citations omitted).

17          "In evaluating the evidence to determine whether there is a genuine issue of fact," the

18   court draws "all reasonable inferences supported by the evidence in favor of the non-moving

19   party."  Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is

20   the opposing party's obligation to produce a factual predicate from which the inference may be

21   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

22   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

23   party "must do more than simply show that there is some metaphysical doubt as to the material

24   facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

25   nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

26   omitted).

27   /////

28   /////

3

**OTHER APPLICABLE LEGAL STANDARDS**

I. <u>Civil Rights Act Pursuant to 42 U.S.C. § 1983</u>

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  <u>See</u> <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of <u>respondeat</u> <u>superior</u> and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  <u>See</u> <u>Fayle v. Stapley</u>, 607 F.2d 858, 862 (9th Cir. 1979); <u>Mosher v. Saalfeld</u>, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  <u>See</u> <u>Ivey v. Board of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

II. <u>The Eighth Amendment and Inadequate Medical Care</u>

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986); <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977); <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976).  In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 298-99 (1991).

4

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference.  See Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).  Before a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835 (quoting Whitley, 475 U.S. at 319).

1    Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S.

2    at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a

3    plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th

4    Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir.

5    1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State

6    Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a] prisoner need not show

7    his harm was substantial; however, such would provide additional support for the inmate's claim

8    that the defendant was deliberately indifferent to his needs."  Jett v. Penner, 439 F.3d 1091, 1096

9    (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

10    Finally, mere differences of opinion between a prisoner and prison medical staff or

11    between medical professionals as to the proper course of treatment for a medical condition do not

12    give rise to a § 1983 claim.  See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012); Toguchi,

13    391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891

14    F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

15   III.  Qualified Immunity

16    Government officials enjoy qualified immunity from civil damages unless their conduct

17    violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910

18    (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is

19    presented with a qualified immunity defense, the central questions for the court are:  (1) whether

20    the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

21    defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

22    was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001).

23    The United States Supreme Court has held that "while the sequence set forth there is often

24    appropriate, it should no longer be regarded as mandatory."  Pearson v. Callahan, 555 U.S. 223,

25    236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a

26    statutory or constitutional violation, "there is no necessity for further inquiries concerning

27    qualified immunity."  Saucier, 533 U.S. at 201.  Likewise, if a court determines that the right at

28    issue was not clearly established at the time of the defendant's alleged misconduct, the court may

1   end further inquiries concerning qualified immunity at that point without determining whether the

2   allegations in fact make out a statutory or constitutional violation.  Pearson, 555 U.S. at 236-242.

3   　　"A government official's conduct violate[s] clearly established law when, at the time of

4   the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

5   official would have understood that what he is doing violates that right.'"  Ashcroft v. al-Kidd,

6   563 U.S.___, ___131 S. Ct. 2074, 2083 (2011) (quoting Anderson v. Creighton, 483 U.S. 635

7   (1987)).  In this regard, "existing precedent must have placed the statutory or constitutional

8   question beyond debate."  Id.  See also Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002)

9   ("The proper inquiry focuses on  . . . whether the state of the law [at the relevant time] gave 'fair

10  warning' to the officials that their conduct was unconstitutional.") (quoting Saucier, 533 U.S. at

11  202).  The inquiry must be undertaken in light of the specific context of the particular case.

12  Saucier, 533 U.S. at 201.  Because qualified immunity is an affirmative defense, the burden of

13  proof initially lies with the official asserting the defense.  See Harlow, 457 U.S. at 812.

14  　　　　　　**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND EVIDENCE**

15  　　The evidence submitted by the defendants in support of their motion for summary

16  judgment establishes the following.  At all relevant times to this suit, defendant Dr. Heatley was

17  the Chief Medical Executive at MCSP.  At all relevant times to this suit, defendant Dr. Smith was

18  the Chief Physician and Surgeon at MCSP.  (Defs.' SUDF 2-3, Heatley Decl., Pl.'s Compl.)

19  　　Plaintiff has had hemangiomas since he was a child.  A hemangioma is a benign tumor

20  made up of blood vessels.  A lay term for a hemangioma is a birth mark.  Plaintiff's hemangiomas

21  are located on the left side of his face along the jaw line, the front of his neck, his tongue, and his

22  lip.  On April 22, 2011, plaintiff arrived at MCSP from Calipatria State Prison and received a

23  medical evaluation.  (Defs.' SUDF at 4-8, Heatley Decl., Pl.'s Compl.)

24  　　Before arriving at MCSP, plaintiff had a prescription for 800 mg of gabapentin three times

25  a day.  Gabapentin is a medication that was originally developed to treat seizure disorders such as

26  epilepsy.  It is also used to treat neuropathic pain.  Neuropathic pain is pain from inflamed or

27  damaged nerves.  Plaintiff also had a prescription for 50 mg of tramadol.  Tramadol is an opioid

28  analgesic or a medication to treat moderate to severe pain.  Plaintiff believes that a combination

of gabapentin and tramadol is the most effective way to relieve the pain he experiences from his condition without causing any side effects.  (Defs.' SUDF at 8-15, Heatley Decl., Pl.'s Compl.)

When plaintiff arrived at MCSP, Dr. Rudas continued plaintiff's prescription for 800 mg of gabapentin three times a day and his prescription for 50 mg of tramadol twice a day as needed. On May 19, 2011, plaintiff's primary care provider evaluated him and requested that prison officials send him to an outside dermatologist.  Plaintiff's prescriptions for gabapentin and tramadol expired on May 22, and June 8, 2011, respectively.  (Defs.' SUDF at 16-19, Heatley Decl.)

On June 13, 2011, his primary care provider performed a pain intake evaluation on plaintiff.  At that time, the left side of plaintiff's face was diffusely enlarged along his jaw and the front portion of his neck.  Plaintiff's tongue and left lip had mild enlargement, and he reported a pain level of 10 on a 1-10 scale (with 10 being maximum pain).  Plaintiff indicated that gabapentin and tramadol help a little to alleviate the pain from his hemangiomas.  Plaintiff appeared comfortable to his primary care provider during the evaluation and appeared to be functioning well.  The areas of reported facial pain were non-tender to the touch and had reduced sensation.  Plaintiff's primary care provider referred plaintiff's case to MCSP's Pain Management Committee ("PMC").  (Defs.' SUDF at 20-27, Heatley Decl.)

The PMC is made up of physicians and mid-level health-care providers. An inmate's primary care provider can request assistance from the PMC in the diagnosis and/or management of the inmate's chronic pain issues.  The PMC will make a recommendation after reviewing an inmate's Unified Health Record ("UHR") and consulting with his primary care providers.  An inmate's UHR contains records of his entire health history since incarceration.  The PMC's recommendation may be to pursue a specific diagnostic and/or therapeutic direction.  A PMC recommendation is reviewed by the referring provider who can choose to either follow or disregard it.  (Defs.' SUDF at 28-33, Heatley Decl.)

On July 9, 2011, plaintiff submitted an inmate health care appeal requesting a prescription for tramadol and gabapentin.  On August 12, 2011, Dr. Hashimoto interviewed plaintiff in connection with his July 9, 2011, inmate health care appeal.  Dr. Hashimoto informed plaintiff

1   that the PMC was going to evaluate his case and offer its opinion as to what should be done to

2   manage his pain.  (Defs.' SUDF 34-36, Heatley Decl., Pl.'s Compl.)

3          On August 18, 2011, plaintiff had a chronic care follow-up appointment for his pain with

4   defendant Dr. Heatley.  Plaintiff's chief complaint was that he was experiencing pain from his

5   hemangiomas.  Plaintiff requested a prescription of morphine, tramadol, or gabapentin to treat his

6   pain.  Based on defendant Dr. Heatley's examination and observation of plaintiff, Dr. Heatley

7   determined that morphine, tramadol, and gabapentin were not medically indicated for his

8   condition.  Other than the August 18, 2011, appointment, defendant Dr. Heatley did not

9   personally treat plaintiff in 2011.  (Defs.' SUDF 37-41, Heatley Decl.)

10         On September 2, 2011, a dermatologist evaluated plaintiff and opined that the only

11  reasonable course of treatment for his hemangiomas was pain relief.  Plaintiff received a

12  prescription for gabapentin after that dermatology appointment.  (Defs.' SUDF 42-43, Heatley

13  Decl.)

14         On September 8, 2011, MCSP's PMC reviewed plaintiff's case.  At the time, defendant

15  Dr. Smith served as a member of the PMC.  The PMC concluded that plaintiff did not suffer from

16  severe pain.  Rather, the PMC determined that plaintiff's pain intake evaluation showed that he

17  had a mild to moderate sensory neuropathy.  The PMC determined that plaintiff was functional

18  and able to perform his major activities of daily living and education.  The PMC found that

19  tramadol and gabapentin were not medically indicated for plaintiff's condition.  The PMC

20  discontinued plaintiff's prescription for gabapentin and advised plaintiff's primary care provider

21  to discuss alternative pain medications with him.  Defendant Dr. Smith had no personal

22  involvement in plaintiff's medical care other than serving as a member of the PMC.   (Defs.'

23  SUDF 44-52, Heatley Decl.)

24         On November 11, 2011, plaintiff was offered medications to reduce his pain, such as

25  amitriptyline, duloxetine, acetaminophen, and nonsteroidal anti-inflammatory drugs.  Plaintiff

26  refused those alternative pain medications.  Plaintiff continues to suffer mild to moderate pain as

27  a result of his hemangiomas.  According to defendant Dr. Heatley, plaintiff does not have a

28  /////

9

1  medical need for tramadol or gabapentin to treat his pain and is able to function without the pain

2  medications.  (Defs.' SUDF 53-57, Heatley Decl., Pl.'s Compl.)

3       According to defendant Dr. Heatley, he as well as defendant Dr. Smith and all of

4  plaintiff's other health care providers at MCSP exercised the degree of skill, knowledge, and care

5  in treating and managing plaintiff's pain that is ordinarily possessed and exercised by other

6  members of the medical profession under similar circumstances.  In Dr. Heatley's view, plaintiff

7  received medically acceptable treatment for his hemangiomas.  (Defs.' SUDF 58-61, Heatley

8  Decl.)

9  **ANALYSIS**

10       Plaintiff's complaint in this action is that the defendants were deliberately indifferent to

11  his serious medical needs with respect to their treatment of his hemangiomas.  Specifically,

12  plaintiff claims that defendants were deliberately indifferent to his serious medical needs when

13  they "disapproved" of his prior treating physicians' surgical requests and recommendations and

14  when they "discontinued" his prescription pain medications for gabapentin and tramadol.  (Pl.'s

15  Compl. at 5-7.)  Below, the court will address the merits of defendants' motion for summary

16  judgment on plaintiff's Eighth Amendment claims.  The court will also address defendants'

17  argument that they are entitled to qualified immunity with respect to plaintiff's claim.  Based on

18  all of the evidence presented in connection with the pending motion for summary judgment, and

19  for the reasons stated below, the undersigned concludes that defendants' motion for summary

20  judgment should be denied.

21  I.  Plaintiff's Eighth Amendment Claims

22       As an initial matter, the court finds, and defendants concede for purposes of summary

23  judgment, that based upon the evidence presented by the parties in connection with the pending

24  motion for summary judgment, a reasonable juror could conclude that plaintiff's hemangiomas

25  constitute an objective, serious medical need.  See McGuckin, 974 F.2d at 1059-60 ("The

26  existence of an injury that a reasonable doctor or patient would find important and worthy of

27  comment or treatment; the presence of a medical condition that significantly affects an

28  individual's daily activities; or the existence of chronic and substantial pain are examples of

1   indications that a prisoner has a 'serious' need for medical treatment."); see also Canell v.

2   Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide

3   medical care applies "to medical conditions that may result in pain and suffering which serve no

4   legitimate penological purpose."). Specifically, plaintiff's well-documented medical history, as

5   well as the observations and treatment recommendations by plaintiff's treating physicians and

6   prison officials compel the conclusion that plaintiff's medical condition, if left untreated, could

7   result in "further significant injury" and the "unnecessary and wanton infliction of pain."

8   McGuckin, 974 F.2d at 1059.

9        The court now turns to defendants' response to plaintiff's serious medical needs. As

10   noted above, plaintiff's medical care claim against the defendants is two-fold. First, plaintiff

11   claims that defendants were deliberately indifferent to his serious medical needs when they

12   "disapproved" of his prior treating physicians' surgical requests and recommendations. (Pl.'s

13   Compl. at 5-7.) Strangely, in moving for summary judgment, defense counsel does not at all

14   address this aspect of plaintiff's claim. However, the court observes that according to plaintiff's

15   medical records submitted by defendants, as early as September 2009 when plaintiff was still

16   incarcerated at Calipatria State Prison, plaintiff began receiving sclerotherapy treatment at U.C.

17   San Diego Medical Center to help manage his medical condition. (Defs.' Mot. for Summ. J., Ex.

18   A (Pt. 1 at 21-22).) On February 28, 2011, two months prior to plaintiff's transfer to MCSP, the

19   Calipatria PMC met and outlined a treatment plan for plaintiff. (Id. (Pt. 1 at 77-78)) That

20   treatment plan included continuing plaintiff's sclerotherapy at U.C. San Diego Medical Center.

21   (Id.) Upon plaintiff's transfer to MCSP, however, it appears from the evidence before the court

22   on summary judgment that medical providers simply never followed-up on plaintiff's treatment

23   plan even though plaintiff submitted health care services requests asking for further sclerotherapy

24   treatment. (Id. (Pt. 1 at 84))

25        Defendants' evidence does not address how or why defendants Dr. Heatley and Dr. Smith

26   reached their decisions, if any, with respect to plaintiff's treatment plan for sclerotherapy. Nor

27   does defendants' evidence address whether the decisions reached by defendants Dr. Heatley and

28   Dr. Smith, if any, with respect to plaintiff's treatment plan for sclerotherapy rose to the level of

11

1    constitutionally inadequate medical care.  Finally, defendants' evidence does not address

2    plaintiff's prior treating physicians' decisions to continue his sclerotherapy which appears to be at

3    odds with the treatment provided by defendants.  It is the defendants' "affirmative duty" as the

4    moving party under Rule 56 to demonstrate their "entitlement to judgment as a matter of law."

5    Martinez v. Stanford, 323 F.3d 1178, 1182-83 (9th Cir. 2003).  Defendants have failed to do so

6    with respect to plaintiff's claim that they were deliberately indifferent to his serious medical

7    needs when they "disapproved" of his prior treating physicians' surgical requests and

8    recommendations.

9         As to the second aspect of plaintiff's claim - that the defendants were deliberately

10   indifferent to his serious medical needs when they "discontinued" his prescription pain

11   medications for gabapentin and tramadol - it is questionable whether defendants have met their

12   initial burden of demonstrating that there is no genuine issue of material fact with respect to the

13   adequacy of the medical care provided to plaintiff.  However, even assuming for the sake of

14   argument that defendants have borne their initial burden, on defendants' motion for summary

15   judgment the court is required to believe plaintiff's evidence and draw all reasonable inferences

16   from the facts before the court in plaintiff's favor.  Drawing all reasonable inferences in

17   plaintiff's favor, the court finds that there is sufficient evidence before the court on summary

18   judgment to demonstrate the existence of a genuine issue of material fact with respect to

19   plaintiff's claim that defendants Dr. Heatley and Dr. Smith responded to his serious medical

20   needs with deliberate indifference.

21        According to plaintiff's medical records submitted by defendants, as early as

22   November/December 2009 when plaintiff was still incarcerated at Calipatria State Prison,

23   plaintiff's medical providers prescribed him gabapentin and tramadol for pain relief.  (Defs.' Mot.

24   for Summ. J., Ex. A (Pt. 1 at 71-75).)  As noted above, on February 28, 2011, two months prior to

25   plaintiff's transfer to MCSP, the Calipatria PMC met and outlined a treatment plan for plaintiff.

26   (Id. (Pt. 1 at 77-78))  In addition to continuing plaintiff's sclerotherapy at U.C. San Diego

27   Medical Center, the Calipatria PMC plan included continuing plaintiff's pain medication

28   prescriptions for gabapentin and tramadol.  (Id.)  Even upon plaintiff's arrival at MCSP, Dr.

1  Rudas continued plaintiff's prescription for gabapentin three times a day and his prescription for

2  of tramadol twice a day as needed. (Heatley Decl.) On May 19, 2011, plaintiff's primary care

3  provider evaluated him and requested that prison officials send him to an outside dermatologist.

4  (Id.) While plaintiff waited to see the dermatologist, plaintiff's prescriptions for gabapentin and

5  tramadol expired on May 22, and June 8, 2011, respectively. (Id.) On August 18, 2011, plaintiff

6  saw defendant Dr. Heatley with a primary complaint of pain. (Id.) It was not until that time that

7  Dr. Heatley determined that tramadol and gabapentin were not medically indicated. (Id.)

8          On September 2, 2011, plaintiff saw Dr. Ely, a dermatologist, at U.C. Davis Medical

9  Center. Dr. Ely wrote to defendant Dr. Heatley and recommended the following treatment plan:

10              This patient has failed sclerotherapy. The vascular tumor is too
               deep for laser therapy and involves much of the tongue. I think the
11             only hope for this man is pain relief. Since he did well on
               Neurontin and Trazadol, this is what I would try first. I would give
12             Neurontin (gabapentin) 300 mg p.o. t.i.d. If this is all he needs, he
               should stay on it for life. If not I would add Trazadol in an
13             appropriate dose.

14  (Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. A.) Six days later, on September 8, 2011, contrary

15  to Dr. Ely's express opinion, defendant Dr. Smith and the other members of the MCSP PMC

16  reviewed plaintiff's case and concluded that tramadol and gabapentin were not medically

17  indicated for his condition and discontinued Dr. Ely's prescription for gabapentin. (Heatley

18  Decl.)

19          On December 21, 2011, plaintiff saw Dr. Ely once more. Thereafter, Dr. Ely wrote to

20  defendant Dr. Heatley again and said:

21              [Plaintiff] suffers from pain from his hereditary hemangioma in his
               jaw and apparently the prison system does not want to treat him
22             with trazodone and gabapentin, which had been working in the past.
               I would suggest that you refer this patient to your pain committee
23             for appropriate pain management. As a dermatologist, I do not
               think I can offer him anything other than what has worked in the
24             past.

25  (Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. A.) According to defendant Dr. Heatley, plaintiff

26  still suffers from mild to moderate pain as a result of his hemangiomas, but in the defendant Dr.

27  Heatley's view, plaintiff nonetheless does not have a medical need for tramadol or gabapentin.

28  (Heatley Decl.)

1    As defense counsel argues, mere differences of opinion between a prisoner and prison

2  medical staff or between medical professionals does not give rise to liability on a § 1983 claim.

3  See Snow, 681 F.3d 987; see also Toguchi, 391 F.3d at 1059-60 ("Dr. Tackett's contrary view

4  was a difference of medical opinion, which cannot support a claim of deliberate indifference.");

5  Sanchez, 891 F.2d at 242 (difference of opinion between medical personnel regarding the need

6  for surgery does not amount to deliberate indifference to a prisoner's serious medical needs).

7  Ultimately, defense counsel may prove this case is simply about a mere difference of opinion

8  between physicians.  On the other hand, plaintiff may well be able to establish that this is instead

9  a case in which the defendants deliberately ignored his various treating physicians' (both outside

10  and at Calipatria State Prison) prescriptions for pain medication.  As discussed above, physicians

11  at Calipatria State Prison had long prescribed plaintiff gabapentin and trazadol for pain relief.  In

12  addition, Dr. Ely, an outside dermatologist MCSP doctors sent plaintiff to see, prescribed him the

13  same medication.  Notwithstanding, defendants refused to provide plaintiff with gabapentin or

14  trazadol for pain relief even though, according to Dr. Ely, that course of treatment had proven to

15  be effective and essentially was the only course of treatment available for the condition.  Based

16  on the evidence in this case, the court finds that plaintiff has raised triable issues of fact as to

17  whether defendants refusal to provide him with gabapentin and trazadol was medically

18  unacceptable.

19    It is well established that deliberate indifference may be shown when prison officials

20  ignore express orders from a prisoner's treating physician(s) and/or when prison officials

21  purposefully ignore or fail to respond to a possible serious medical need.  See Estelle, 429 U.S. at

22  104-05 (deliberate indifference may manifest "by prison doctors in their response to the

23  prisoner's needs or by prison guards in intentionally denying or delaying access to medical care

24  or intentionally interfering with the treatment once prescribed"); Snow, 681 F.3d at 988 (non-

25  treating, non-specialist physicians may have been deliberately indifferent to prisoner's needs

26  when they repeatedly denied outside specialists' recommendations for hip-replacement surgery);

27  Jett, 439 F.3d at 1097-98 (prison doctor may have been deliberately indifferent to a prisoner's

28  medical needs when he decided not to request an orthopedic consultation as the prisoner's

1   emergency room doctor had previously ordered); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir.

2   2000) (a prisoner may establish deliberate indifference by showing that a prison official

3   intentionally interfered with his medical treatment); Wakefield v. Thompson, 177 F.3d 1160,

4   1165 & n.6 (9th Cir. 1999) ("a prison official acts with deliberate indifference when he ignores

5   the instructions of the prisoner's treating physician or surgeon."); McGuckin, 974 F.2d at 1061

6   ("the more serious the medical needs of the prisoner, and the more unwarranted the defendant's

7   actions in light of those needs, the more likely it is that a plaintiff has established 'deliberate

8   indifference' on the part of the defendant.").

9       In sum, based on the record in this case, the court finds that a reasonable jury could

10   conclude that defendants were deliberately indifferent to plaintiff's serious medical needs.

11   Accordingly, defendants' motion for summary judgment on plaintiff's Eighth Amendment claims

12   should be denied.

13   II.  Qualified Immunity

14       The court will now address defense counsel's contention that the defendants are entitled to

15   qualified immunity on plaintiff's Eighth Amendment claims.  Viewing the facts of this case in the

16   light most favorable to the plaintiff, defendants violated plaintiff's constitutional rights.  As

17   discussed above, deliberate indifference may be shown when prison officials ignore express

18   orders from treating physicians and/or when prison officials purposefully ignore or fail to respond

19   to a serious medical need.  See Snow, 681 F.3d at 988; McGuckin, 974 F.2d at 1060.

20       Moreover, by 2011, when defendants' involvement in plaintiff's medical treatment took

21   place, "the general law regarding the medical treatment of prisoners was clearly established," and

22   "it was also clearly established that [prison staff] could not intentionally deny or delay access to

23   medical care."  Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002).  In this regard, defendants

24   should have known that ignoring express orders from plaintiff's treating physician(s) and/or

25   purposefully ignoring or failing to respond to his serious medical needs violated his rights under

26   the Eighth Amendment.  Accordingly, defendants' motion for summary judgment based on the

27   affirmative defense of qualified immunity should be denied.

28   /////

1

**CONCLUSION**

2        For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that defendants'

3   motion for summary judgment (Doc. No. 26) be denied.

4        These findings and recommendations are submitted to the United States District Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6   after being served with these findings and recommendations, any party may file written

7   objections with the court and serve a copy on all parties.  Such a document should be captioned

8   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

9   objections shall be filed and served within fourteen days after service of the objections.  The

10   parties are advised that failure to file objections within the specified time may waive the right to

11   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12   Dated:  November 6, 2013

13

14   _____
     DALE A. DROZD
15   UNITED STATES MAGISTRATE JUDGE

DAD:9
16   esco0773.57

17

18

19

20

21

22

23

24

25

26

27

28

16